IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

TERRY PORTER,

        Plaintiff,

V.                                 CIVIL ACTION NO. 3:05-0524

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**FINDINGS AND RECOMMENDATION**

        In this action, filed under the provisions of 42 U.S.C. §§405(g) and 1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

        Plaintiff protectively filed his applications on July 23, 2003, alleging disability commencing October 16, 2002, as a consequence of two bulging discs in his neck and pain in the left shoulder. On appeal from initial and reconsidered denials, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

At the time of the administrative decision, plaintiff was thirty-five years of age and had obtained a high school education. His past relevant employment experience consisted of work as a chainsaw operator and machinist. In his decision, the administrative law judge determined that plaintiff suffers from "chronic pain syndrome (post concussive headache), myofascial pain syndrome (shoulder pain), degenerative joint disease, borderline intellectual functioning, a depressive disorder, and generalized anxiety disorder," impairments which he considered severe. Though concluding that plaintiff was unable to perform his past work,[1] the administrative law judge determined that he had the residual functional capacity for a limited range of light level work. On the basis of this finding, and relying on Rule 202.20 of the medical-vocational guidelines[2] and the testimony of a vocational expert, he found plaintiff not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision. Plaintiff suffered a work-related injury on June 18, 2001, when he was hit on the left side by a large branch. He temporarily lost consciousness but was subsequently able to leave the woods on his own. After being examined at a local emergency room, plaintiff was sent home as the doctors did not consider his injuries significant enough to admit him. According to his reports, he was off work for two weeks and then resumed his logging job, where he continued working until October 16, 2002, though there were breaks in this employment depending on the availability of work.

---

[1] This finding had the effect of shifting a burden of production to the Commissioner with respect to other work plaintiff was capable of performing. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981); McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

[2] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2.

An X-ray of plaintiff's cervical spine, taken in July 2001, showed only mild degenerative changes from C4 through C6. Similarly, there was only mild spurring at the L4 and L5 levels in the lumbar spine. A neurosurgeon who evaluated plaintiff on April 2, 2002, for complaints of headaches, diagnosed post-concussive headaches and cervical sprain and interscapular pain due to a sprain/strain type of injury. This physician instructed plaintiff to continue treatment with a family physician and plaintiff went to Dr. Charles Vance who mainly utilized medication to treat his complaints of neck and left shoulder pain and headaches. Unfortunately, his findings are very difficult to read. He did refer plaintiff for additional evaluation by an ophthalmologist due to plaintiff's reports of blurred vision and headaches. Dr. Dale Lilly examined plaintiff four times between December 9, 2003 and August 2, 2004. His reports reflect visual acuity measurements of 20/20 and 20/25, but are also very difficult to read. It does not appear from an examination of the record as a whole that he detected any significant abnormalities with plaintiff's eyes.

Plaintiff apparently was involved in a motor vehicle accident on February 10, 2003. He did not lose consciousness but did hit his head. Dr. Jack Steel treated him for approximately two months thereafter and related that a cervical spine X-ray from this time showed no significant degenerative arthritic changes and also that a prior X-ray of the left shoulder was normal. Decreased sensation in two fingers on the left hand was subsequently detected, and Dr. Steel felt plaintiff had cervical sprain accompanied by left C5 radiculopathy symptoms. An MRI performed April 12, 2003, was interpreted as showing "mild" disc desiccation from C2 to C7 with a question of a protrusion at C5-6. Another MRI was done five days later and interpreted as showing no evidence of disc protrusion and only "minor" degenerative changes at C3-4. Dr. Steel noted on April 23,

2003, that plaintiff continued having left scapular pain and that he had offered for him to see a neurosurgeon.

On June 24, 2003, plaintiff did see Dr. David Weinsweig, a neurosurgeon, who reported that exam revealed "reasonable" range of motion of the neck. Upper extremity strength, sensation and reflexes were described as normal. He referred plaintiff for cervical spine X-rays and a bone scan, and both were interpreted as showing a "clay shoveler's" type injury in the neck with a bony fragment projecting at the C6 level. Dr. Weinsweig wanted to get plaintiff into a pain clinic so he was sent to Dr. Glen Imlay at the Holzer Clinic.

Dr. Imlay's initial findings in October of 2003 reflected restricted range of motion of the neck; decreased strength and sensation in the left upper extremity; and, tenderness in various areas of the left shoulder. No change in symptoms was reported by plaintiff until after he received injections in three areas in the upper left arm/shoulder on December 11, 2003. These were somewhat helpful; however, he was involved in another motor vehicle accident in January 2004 which irritated his symptoms. On February 9, 2004, Dr. Imlay administered more injections which plaintiff reported helped for about two weeks. At the next visit on March 9, 2004, this physician indicated that he wanted to get plaintiff into a work rehabilitation program, but, in the meantime, he felt plaintiff should be able to do some type of sedentary job in light of the negative anatomical studies contained in his record. Upon his return two months later, plaintiff told Dr. Imlay his back was "fine" and his neck was "okay." Work conditioning did bother his shoulder, however. Exam revealed full strength and normal sensation in the shoulder and it was concluded that his biceps tendinitis and subacromial bursitis were stable. Two weeks after this visit, complaining he could not move his neck, plaintiff requested to be sent elsewhere for work training.

Upon recommendation of one of plaintiff's treating physicians, he was sent to Steven Cody, Ph.D., for a neuropsychological evaluation on November 19, 2003. Among the problems which plaintiff related were blackouts, periods when he was unable to see, headaches and mood swings. He had been prescribed medication for the mood swings but had no relief and had not been referred for psychiatric or psychological treatment. Plaintiff told Dr. Cody he was able to independently perform activities of daily living, to drive, shop and do his laundry.

Dr. Cody observed a depressed mood, restricted affect and no overt pain behavior except slow and antalgic movements. His diagnosis was major depression, single episode, mild to moderate; cognitive disorder, NOS; pain disorder associated with psychological factors and general medical condition; and, rule out dementia due to head injury. He concluded plaintiff had suffered a closed-head injury at the time of his accident in 2001 but that it was mild. He also recommended neuropsychological testing to determine the extent of any cognitive deficit resulting therefrom as well as a psychiatric evaluation to find appropriate medication for plaintiff's depression.

Following the second hearing, plaintiff was sent to Dr. David Frederick for evaluation. He displayed a sad mood and flat affect but interacted well, was motivated, had good insight and a mild sense of humor. Judgment and recent memory were felt to be moderately deficient with immediate memory and concentration considered mildly deficient. I.Q. testing produced scores in the borderline range, with plaintiff noted to be persistent and focused. The "Cognistat" test produced scores consistent with mild memory impairment. Dr. Frederick diagnosed generalized anxiety disorder, major depressive disorder, single episode, moderate, and borderline intellectual functioning. He characterized plaintiff's daily activities as normal but noted his reports of mood swings and irritability with others when considering the area of social functioning. This

5

led him to assess plaintiff as "poor" (seriously limited but not precluded) in the areas of relating to co-workers and dealing with the public, when evaluating plaintiff's mental residual functional capacity. He also assessed him as "poor" in the areas of using judgment, dealing with work stresses and understanding, remembering and carrying out complex job instructions.

Reports from Dr. Imlay of appointments in July and August 2004, indicate that plaintiff's shoulder pain was the only problem about which plaintiff complained. At the latter exam, this physician observed only "slight" tenderness in the three areas which he had previously injected. He concluded, based on exam and test results, that there was not an anatomical cause for plaintiff's symptoms, adding that his prescription of Lortab for pain relief was not warranted. He saw plaintiff several more times for the same complaints and did a trigger point injection on December 6, 2004.

Finally, the Commissioner sent plaintiff to Dr. Drew Apgar for a consultative physical examination on August 27, 2004. This physician observed plaintiff had no problem moving about the room or getting on/off the exam table. Uncorrected visual acuity was measured at 20/25 in each eye and 20/20 together. There was no evidence of atrophy in the upper or lower extremities. Muscle strength was 4/5 in the left upper extremity, 5/5 in the right, and shoulder movements were within normal limits bilaterally. Manipulation and pinch were intact bilaterally as was ability to grasp, even though it was slightly less in the non-dominant hand. Exam of the back was considered normal and Dr. Apgar opined that plaintiff would have no difficulty standing, walking, sitting, handling objects with the dominant hand, hearing, speaking or traveling. He felt there "may" be "some" problem with lifting, carrying and pushing/pulling. A residual functional capacity assessment was consistent with these conclusions as it reflects an ability to lift/carry twenty pounds occasionally, ten frequently, with limited pushing and pulling with the left upper extremity.

Environmental limitations included temperature extremes, noise, dust, vibration, humidity, wetness and fumes.

After considering the various opinions, treatment notes and other evidence in the record, the administrative law judge concluded Dr. Apgar's assessment was the most persuasive. He did add a limitation that plaintiff could use the left upper extremity for overhead reaching only on an occasional basis. The administrative law judge further determined that, mentally, plaintiff would experience the "poor" abilities in the areas found by Dr. Frederick, adding that plaintiff could not comfortably be around other people. The Court concludes that the administrative law judge's analysis of the evidence and his findings based thereon are supported by the evidence, which reflects mild changes observed on X-ray and MRI; improvement of back and neck problems; improvement in radicular symptoms down the left upper extremity; and, improvement of the left shoulder to the point that Dr. Apgar did not observe any limitation of motion. As far as plaintiff's vision is concerned, Dr. Lilly's reports do not appear to contain any findings suggestive of a significant vision impairment or any condition which would explain his blurred vision and blackouts. There is clearly no need to further explore this issue with Dr. Lilly, as plaintiff suggests.

While plaintiff alleged significant limitations on his activities due to pain and anxiety/depression, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded that his testimony was not entirely credible. As support for this finding, the administrative law judge cited a number of factors including a lack of objective evidence supporting plaintiff's testimony concerning the effect of his impairments; the significant difference between his reports to doctors and their actual observations; the lack of evaluation for his alleged blackout spells; the lack of formal mental health treatment for his anxiety

7

and depression; and, his ability to interact well with examiners despite his reports that he cannot stand to be around people. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Finally, in response to hypothetical questioning which included plaintiff's age, education, work experience and a reasonably accurate profile of his functional capacity and overall medical condition, a vocational expert testified that there were significant numbers of light and sedentary jobs in the national economy which plaintiff could perform.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments and residual functional capacity. Under such circumstances, the decision of the Commissioner should be affirmed.

## RECOMMENDATION

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, United States District Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED: February 22, 2007

_____
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE